**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **RENA LEE CONDON,** | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) **C.A. 13-cv-30013-MAP** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of the Social** | ) |
| **Security Administration,** | ) |
| **Defendant** | ) |

**MEMORANDUM AND ORDER REGARDING**
**PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS**
**AND DEFENDANT'S MOTION FOR ORDER AFFIRMING COMMISSIONER**
**(Dkt. Nos. 14 & 19)**

**December 9, 2013**

**PONSOR, U.S.D.J.**

## I. INTRODUCTION

Plaintiff, Rena Lee Condon, has appealed the final
decision of Defendant, Commissioner of the Social Security
Administration, denying her application for Social Security
Disability Insurance Benefits and Supplemental Security
Income. Counsel appeared for argument on the parties'
cross-motions on November 19, 2013. At issue was whether
the Administrative Law Judge ("ALJ") improperly discounted
Plaintiff's treating physician's opinion. At the conclusion

**of the hearing, the court indicated that it was going to**

**allow Plaintiff's Motion for Judgment on the Pleadings,**

**(Dkt. No. 14), and deny Defendant's Motion for Order**

**Affirming Decision of the Commissioner, (Dkt. No. 19).  This**

**memorandum will summarize the court's reasoning.**

## II.  **FACTS**

**At the time of her application, Plaintiff was forty-six**

**years old.  She alleged disability due to fibromyalgia,**

**cysts in her left knee, migraines, depression, and anxiety.**

**(SSA Admin. R. of Soc. Sec. Proceedings 137, Dkt. No. 13**

**(hereinafter A.R.).)  She had a ninth grade education and**

**was previously employed as a cashier, a customer service**

**representative, and a housekeeper.  (A.R. 162.)**

## A.  **Medical Conditions[1]**

**Dr. Thirupudaimaru Raman has been Plaintiff's primary**

**care physician since 2004.  Plaintiff first presented to him**

**with diffuse body pain and increasing pain in her left hip.**

---

**[1] Plaintiff alleged both physical and mental disabilities.
At oral argument, the parties acknowledged that the case
hinges on Plaintiff's physical ailments.**

**(A.R. 1056.)   On April 23, 2004, Dr. Ramon diagnosed Plaintiff with osteopenia.[2]   (A.R. 1051.)**

**Throughout 2007 and 2008, Plaintiff suffered from increasing pain in her lower back, neck, and shoulders. (A.R. 1026.)   A musculoskeletal examination revealed spasms and associated joint pain.   (A.R. 1018.)   During that time, a rheumatologist also treated Plaintiff and diagnosed her with fibromyalgia. (A.R. 1017.)**

**In 2009, Plaintiff continued to report increasing pain in her left knee and her back.   (A.R. 971.)   Dr. Raman observed that Plaintiff had "difficulty walking," cramps in her left leg, and tenderness in her joints.   (A.R. 971-72.)**

**On February 26, 2010, Dr. Raman independently diagnosed Plaintiff with fibromyalgia.   (A.R. 963-64.)   He identified her symptoms as widespread pain for at least three months, pain on both sides of the body, pain above and below the waist, and pain in the axial skeleton.   (A.R. 1033.)**

**Over the course of 2010, Plaintiff's symptoms deteriorated.   On several occasions, the doctor noted:**

---

[2] **An individual will be diagnosed with osteopenia if her  bone mineral density is below average, but higher than the diagnostic level for osteoporosis.   Osteopenia is established through a bone mineral density test and indicates that an individual has fragile bones.**

weight change, fatigue, arthritis, cervical pain, decreased range of motion, joint pain, joint stiffness, low back pain, and depression.  (A.R. 957.)  On another visit in 2010, Dr. Raman detected ten points of tenderness and unusual swelling in Plaintiff's neck.  (A.R. 951-52.)  At yet another appointment in 2010, Plaintiff reported that the pain medicines "helped," but she still suffered from excruciating pain in her knee and low back.  (A.R. 939.)

Plaintiff continued to suffer from pain in 2011.  At one appointment, Dr. Raman observed that Plaintiff had abnormal "range of motion" and "gait."  (A.R. 1210.)  He referred Plaintiff to the Baystate Pain Management Center for an assessment.  (A.R. 1150-53.)  There, she classified her discomfort as a six out of ten generally, and a ten out of ten at its worst.  (A.R. 1151.)  She claimed that the distress limited her ability to sleep, impacted her activity level, suppressed her appetite, and affected her mood.  (Id.)

In June 2011, Dr. Raman completed a Physical Residual Functional Capacity (RFC) Questionnaire on Plaintiff's behalf.  He described Plaintiff as suffering from generalized pain and weakness, arm pain, fatigue, and

depression. (A.R. 1082.) She was diagnosed with fibromyalgia and was prescribed medication for the pain. (Id.) According to Dr. Raman, Plaintiff's impairments, particularly the magnitude of her discomfort, would interfere with her ability to maintain attention and concentration. Even low stress jobs would be difficult. (Id.) In his opinion, she would have both good and bad days. (A.R. 1085.) As a result of these fluctuations, she would need to take constant breaks during an eight-hour workday and would likely be absent from work at least four days per month. (A.R. 1084-85.)

## B. Disability Evaluations

Plaintiff underwent two consultive examinations at the request of the Social Security Administration. On September 8, 2009, Plaintiff met with Dr. Leon Hutt. They discussed Plaintiff's daily activities, and "[s]he reported suffering from fibromyalgia and migraine headaches." (A.R. 239.)

Her second consultive examination occurred on August 22, 2010, with Dr. Robert Sampson. Although they also discussed her ability to do certain tasks, she again complained about the significant pain associated with her fibromyalgia. (A.R. 904-05.)

**In addition to the consultive examinations, two non-treating physicians analyzed her physical capacity. On September 10, 2010, Dr. Elaine Hom found Plaintiff capable of lifting and carrying twenty pounds occasionally, and ten pounds frequently. (A.R. 911-12.) She also found Plaintiff able to climb, balance, stoop, kneel, crouch, and crawl occasionally. (A.R. 913.) On February 21, 2011, Dr. Malin Weeratne concurred with Dr. Hom's assessment.**

**C.   ALJ Hearing**

**Plaintiff's ALJ hearing occurred on November 2, 2011, before ALJ Addison C.S. Masengill. A non-attorney representative from the Law Office of Thomas M. Libbos, F. Bruce Ferin, represented Plaintiff.**

**At the hearing, Plaintiff elaborated on the intensity of her pain. (A.R. 35.) Although she tried medication and physical therapy, neither solved her problems. (A.R. 35-36.) She classified her pain as a ten out of ten without medication, and a seven out of ten with medication. (A.R. 39-40.) Any type of movement exacerbated her pain. (Id.) While Plaintiff noted that she had both good and bad days, she added that an extensive amount of physical activity one day would leave her incapable of moving the next. (A.R.**

**36.)  Plaintiff also testified that she had multiple cysts around her left knee and suffered from migraines a few times per week.  (A.R. 37.)**

**Plaintiff attributed the many limitations in her life to her disorders.  Because of pain, she could only sit for roughly fifteen minutes, could only stand for ten minutes, and could only walk one block before needing rest.  (A.R. 41, 45, & 46.)  Although she could lift five pounds, she needed to use two hands to pick up a gallon of milk, (A.R. 41-42), and any attempt to grasp items left Plaintiff with numbness and tingling in her hands.  (A.R. 36 & 42.)  She further described her difficulty bending, crouching, and kneeling.  (A.R. 46.)  Plaintiff discussed some of her daily activities, but stated that she usually needed her husband's assistance to complete these tasks.  (A.R. 40 & 48.)**

**Erin Bailey, a vocational expert, also testified at the hearing.  The ALJ asked the expert whether any jobs were available for someone with Plaintiff's age, education, and work experience, but who was limited to light work with specific restrictions.  (A.R. 57-58.)  The expert concluded that such an individual could work as a cleaner, a cafeteria attendant, or an inspector.  (A.R. 58.)  The ALJ then asked**

**what jobs were available if the same hypothetical person needed to be off task at least twenty-five percent of the workday.  (Id.)  The expert testified, "There'd be no jobs available in the national or regional economy."  (Id.) Plaintiff's representative followed up and asked whether any jobs would be available if Plaintiff needed to be absent for at least four days per month.  (A.R. 59.)  The expert concluded that "[t]he individual would be considered unemployable on a full-time and consistent basis."  (Id.)**

**D.   ALJ Decision**

**The ALJ followed the five-step sequential disability determination.  20 C.F.R. § 416.920.  At step one, the ALJ found that Plaintiff had not been engaged in substantial gainful activity since August 1, 2005, the alleged onset date of her disability.  (A.R. 11.)  At step two, the ALJ classified Plaintiff's fibromyalgia, migraine headaches, and osteopenia as severe impairments.  (Id.)  At step three, the ALJ decided that Plaintiff's impairments did not meet or medically equal an entry on the List of Impairments.  (Id.) Proceeding to step four, the ALJ found that Plaintiff had a**

RFC to perform "light work" as defined in 20 C.F.R. §§

404.1567(b) & 416.967(b),[3] with the following limitations:

> simple unskilled tasks; no work at heights or
> using ladders, ropes, scaffolding; no greater than
> occasional use of ramps, stairs, stooping,
> crawling, crouching, or kneeling; no more than
> incidental exposure to extremes of cold or
> vibration; no overhead lifting or reaching; no
> greater than occasional co-worker/public contact;
> and no operation of left foot/leg controls.

(A.R. 12.)

Based on this, at step four, the ALJ deemed Plaintiff

incapable of performing her past relevant work.  (A.R. 15.)

At step five, however, the ALJ found Plaintiff capable of

doing work that existed in significant numbers in the

national economy, such as a cleaner, a cafeteria attendant,

and an inspector.  (A.R. 15-17.)  Thus, the ALJ concluded

that Plaintiff was not disabled, as defined under the law.

## III.  DISCUSSION

### A.  Standard of Review

A district court should only overturn an ALJ's decision

if it is not "supported by substantial evidence and based on

---

[3] "Light work" involves "lifting no more than 20 pounds
at a time with frequent lifting or carrying of objects
weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), &
416.967(b). It may also require a good deal of walking,
standing, or sitting with some light pushing or pulling of
arm or leg controls.

the correct legal standard."  42 U.S.C. § 405(g); Manso-
Pizzarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st. Cir. 1996).
Since the responsibility for weighing conflicting evidence
belongs to the Commissioner, Seavey v. Barnhart, 276 F.3d 1,
10 (1st Cir. 2001), his findings "as to any fact, if
supported by substantial evidence, shall be conclusive."  §
405(g).  Substantial evidence means "a reasonable mind,
reviewing the evidence in the record as a whole, could
accept it as adequate to support his conclusion."  Rodriguez
v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st
Cir. 1981)(citations omitted).

## B.  Weight of the Treating Physician's Opinion

     In making an evaluation, the ALJ must give controlling
weight to a treating source's opinion "on the issue(s) of
the nature and severity [of the patient's] impairments(s),"
so long as the opinion "is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and
is not inconsistent with other substantial evidence."  20
C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2); Ormon v. Astrue,
497 Fed. App'x. 81, 84 (1st Cir. 2012).  Underlying this
"treating physician rule" is the notion that a treating
doctor will have a better understanding of his or her

**patient's limitations. "[T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture . . . and may bring a unique perspective to the medical evidence . . . ." 20 C.F.R. § 404.1527(c)(2). The ALJ must have "good reasons" for de-emphasizing a treating physician's opinion. Id.**

**Defendant's predominant argument is that there was substantial evidence contradicting Dr. Raman's conclusions. Defendant emphasizes that an ALJ may "grant a treating physician's opinion little weight when it is 'internally inconsistent or inconsistent with other evidence in the record.'" Gregory v. Astrue, No. 11-cv-30281-KPN, 2012 WL 5899235, at *3 (D. Mass. Oct. 25, 2012), citing Arruda v. Barnhart, 314 F. Supp. 2d 52, 71-72 (D. Mass. 2004).**

**Although there was some evidence undermining Dr. Raman's analysis, there was not substantial, inconsistent evidence. "When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around." Goatcher v. Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995)(citation omitted). Although**

-11-

Defendant highlights three alleged inconsistencies in the record, they are not actually incompatible with Dr. Raman's analysis nor do they outweigh his conclusions.

First, the ALJ invoked Dr. Raman's own treatment notes. In Defendant's view, Dr. Raman's notes failed to highlight the same severe level of disability as his responses in the RFC questionnaire. The problem here is that Dr. Raman's treatment notes, viewed in their totality, were consistent with his conclusion that Plaintiff's pain would be so extensive as to render her unable to work for at least four work days a month. (A.R. 1085.) Cf. Simpson v. Comm'n of Soc. Sec., 344 Fed. App'x. 181, 193 (6th Cir. 2009)(viewing the treatment records in their totality to determine whether they were consistent with the doctor's broader conclusions). Although Dr. Raman's notes did not state the precise conclusion found in his RFC questionnaire, they did, over time, describe Plaintiff's deteriorating condition. (A.R. 939, 943, 944, 951, 952, 963, 964, 971, 1017, 1026, 1033, 1038, 1056, 1150, 1151, 1152, 1153, 1209, 1210, & 1216.) Dr. Raman's opinion in the RFC questionnaire was merely an elaboration on those previous findings. In reaching that broader determination, Dr. Raman took into account

-12-

Plaintiff's treatment plan, subjective pain, and medical diagnoses.  Therefore, rather than creating an inconsistency, the notes, when viewed collectively, establish the basis for Dr. Raman's later conclusions.

The ALJ next relied on Plaintiff's own descriptions of her physical capacity and daily activities.  Here, too, Plaintiff's testimony was in accordance with Dr. Raman's analysis.  Plaintiff explicitly testified that she experienced good and bad days.  (A.R. 36.)  Indeed, she explicitly said that if she exerted a significant amount of physical activity one day, she "can't move the next day." (A.R. 45.)  She testified that she was able to do a number of different tasks, but added that she generally needed her husband's assistance.  (A.R. 40 & 48.)  Plaintiff's testimony was essentially: on some days I can do a number of tasks; on others, I can do nothing.  That testimony is consistent with the finding that Plaintiff would need to miss at least four work days a month.

Finally, the ALJ turned to the conclusion, as reached by each of the non-treating physicians, that Plaintiff was not disabled.  While the non-treating physicians opined that Plaintiff could perform "light work" with limitations, that

**belief is not necessarily inconsistent with Dr. Raman's
conclusion.  These physicians determined that Plaintiff was
generally capable of doing certain work.  However, they did
not address the question of whether Plaintiff's pain would
be so debilitating as to force her to miss work at least
four days a month.  Without that affirmative conclusion, the
non-treating physicians' opinions can be, and should be,
read in tandem with Dr. Raman's conclusions.[4]**

**Ultimately, the ALJ improperly limited the weight of
Dr. Raman's opinions.  Had the ALJ given it the significance
it was entitled to, the ALJ would have concluded that
Plaintiff was solely limited to work where she could miss
four or more days a month and where she would need an
unworkable number of breaks throughout the day.**

## IV.  CONCLUSION

**For these reasons, Plaintiff's Motion for Judgment on
the Pleadings (Dkt. No. 14) is hereby ALLOWED, and**

--------

[4] **Even if the non-treating physicians' opinions were
inconsistent, the ALJ gave them far more weight than they
were entitled to.  As this court has said, "Reports from
non-examining physicians that contain little more than brief
conclusory statements or the mere checking of boxes . . .
are entitled to relatively little weight."  Traynham v.
Astrue, 925 F. Supp. 2d 149, 160 (D. Mass. 2013) citing
Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d
427, 431 (1st Cir. 1991)(quotation marks omitted).**

Defendant's Motion for Order Affirming Decision of the Commissioner (Dkt. No. 19) is hereby DENIED.

The clerk is ordered to enter judgment for Plaintiff and remand the case to the Social Security Administration for further proceedings consistent with this decision. This case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

-15-